Chief Justice Robertson
delivered the Opinion of the Court.
A fieri facias in favor of Vinton and Rockhill, another in favor of Gill, and two others in favor of the Bank of the Commonwealth, all against Jacob H. Holeman, having been levied, in May, 1832, on a female slave (Laura,) and various articles of household furniture then in his possession in Frankfort, and all of which property had been previously mortgaged by him to Yinton and Rockhill, as a collateral security for about four hundred and fifty dollars, the debt for which their said execution was issued — the slave and furniture, at the instance, or with the concurrence, of the execution creditors, were nevertheless left in Holeman’s possession by the sheriff; who, as he himself says, proposed to sell the property more than once, between the date of the levy and the succeeding December, but was, in each instance, directed by the creditors, or their agents, to defer the sale.
Laura having been carried by Mrs. Holeman to the county of Jessamine, in December, 1832, a fieri facias, in favor of Benjamin F. Thomas, and against Jacob H. Holeman, was there levied on the said slave, and Philip Swigert, as agent of the sheriff of Franklin and of Yinton and Rockhill, having asserted a prior right to Laura, under the mortgage and the levy, in May, 1832 ■ — a jury, empannelled to try the right of property, decided that she was not subject to sale under Thomas’s execution. Whereupon, the sheriff, being indemnified by Thomas, sold Holeman’s equity of redemption under the execution in favor of Thomas, who became the purchaser, at the price of twenty five dollars; gave bond, according to the provisions of the statute of 1828, for the forthcoming of the slave within one year, and took her into possession; whereupon, Swigert, as agent as *221 ■aforesaid, and John M. Shreve forcibly rescued her, and having restored her to Holeman in Frankfort, the equity of redemption in her and the household furniture was afterwards sold by the sheriff of Franklin, and Swigert having become the purchaser, he permitted Holeman to take and sell her, by private contract, for a sum with which he discharged the mortgage debt.
The action, judg ment &c-
Instructions,
Annuity of red®mPlj°“ 1S “ot under the mort-mortgage debt: such levy and sale are void.
The simple de-bleprop^rty”by a debtor after the up/n'il'is not— i“ this State , where it is common to permit such retention— necessarily a fraud upon other creditors of the same debtor; and if such permission is not extended beyond the time when the sale ought to be made, it should not be deemed even prima fade evidence of fraud: though it may be slight evidence of collusion. But—
For the forcible taking of the slave in Jessamine, Thomas sued Swigert and Shreve, in an action of trespass, and recovered a judgment for eight hundred dollars, in damages; to reverse which, this appeal is prosecuted.
The only questions for revision are presented by instructions to the jury, on the trial.
The Circuit Judge instructed the jury: first — that the levy in favor of the mortgagees, was void; secondly — that all the levies in May, 1832, should, upon the facts exhibited, be deemed fraudulent as to Thomas; thirdly — that, if Thomas had a title to damages, he had a right to recover the value of Laura at least; and fourthly — that, after the sale of the equity of redemption to Thomas, and the delivery of the slave to him by the sheriff, the mortgagees had no right to the possession of her, and therefore Swigert, as their agent, had no right to take her.
First. It has been decided by this Court, that the mortgagor’s equity of redemption is not subject to the mortgagee’s execution on a judgment for the mortgage debt: and therefore, the levy in favor of Vinton and Rockhill, on Holeman’s equity of redemption, should— as decided by the Circuit Judge — be deemed void.
Second. Prior to the American revolution, the prevailing doctrine in England was, that the retention of possession of movable property by the debtor, with the assent of the creditor, and without any effort by him to sell it in the usual time, notwithstanding a levy of his , N ,. . .. , . , (the creditor’s) execution upon it, was, if unexplained, prima facie evidence of fraud between them, so far as *222 any other judgment creditor of the same debtor was concerned.
If a debtor, on whose movable property an execution is levied, is permitted to retain, and consume or sell it; or if he is allowed to retain it indefinitely, without any effort on the part of the creditor to have it sold, this, in the absence of countervailing proof, would be sufficient evidence of a fraud upon (>- ther creditors.
Qu. — whether there should be
But the more modem rule in England seems to be that, in such a case, the fact that the possession did not accompany the title acquired by the officer in virtue of his levy, may be, per se, fraudulent in judgment of law.
This latter doctrine has never been recognized in Kentucky; nor, in our opinion, should it ever be. The post-revolutionary decisions in England are not authoritative evidences of the common law here. And, as the judicial rule as to conclusive legal fraud, is not, in our judgment, consistent with either the analogies or ends of the law, we will not extend it farther than it was authoritatively established in England antecedently to the 4th of July, 1776. We cannot admit, therefore, that the simple retention of movable property by the debtor, after the levy of an execution upon.it, should be deemed necessarily a fraud in law on other creditors of the same debtor. And, if such possession be not continued longer than a vigilant officer may be conveniently able to sell the property, we should be inclined to the opinion, that such a fact, so common in the practice of this country, and so compatible, therefore, with good faith, should not alone be even prima facie proof of a fraudulent intent — though it might be some slight evidence of collusion.
But we do not doubt that, either such a retention of possession, with a right in the debtor to consume or sell the property, or any indefinite holding by the debtor, without any effort by the creditor to sell the property, within the ordinary or usual time, should be deemed prima facie evidence of collusion to the prejudice of other bona fide creditors — that is, sufficient proof of fraud until the contrary appears.
This is the established doctrine in New York. (Farrington vs. Caswell, 15 Johnson’s Rep. 428—9—30.) And it is, we think, the more rational and just doctrine.
In this case, the continued possession by Holeman, for months after the levy, must, as unexplained, be deemed unusual and unreasonable, and, therefore, prima facie fraudulent. Consequently, as there was no attempt to *223 repel that presumption, (and which was even fortified in some degree by other facts,) it was the duty of the jury to find that the levy, in May, 1832, was void, so far as Thomas was concerned as a subsequent execution creditor. And therefore, though the Circuit Judge was technically inaccurate in instructing the jury that, upon the only facts exhibited, and in which there was no contrariety, the levy, in May, 1832, “ was fraudulent” without intimating any qualification — nevertheless, as it should have been so considered by the jury, in the absence of any repellent or explanatory evidence, the unqualified instruction, as given, should not perhaps be deemed to havé been prejudicial, though in form it may have been erroneous. But, as the judgment must be reversed on another point, we need not decide this definitively.
a reversal, for instructions technically erroneous , when the verdict, with or without them, must have been the same.
The mortgagees of a slave (by their agent,) forcibly tookitfrom a purchaser, to whom the sheriff, upon selling the equity of redemption under execution, had de livered it ; and the slavq was af-terwards sold,& the proceeds applied to the satisfaction of the mortgage debt. If the purchaser could maintain trespass for such a taking, his dam ages could not ex ceed the value of the equity of redemption , which, only, he had acquired by his pur chase.
Where an agent had authority from two different constituents, for the same act, tho’ he ostensibly acted under the one, he may justify under the other.
Third. If Thomas had a legal right to damages — yet, if, as the jury might perhaps have inferred, the appellants acted as the authorized instruments of the mortgagees in taking Laura out of his possession, and she was, afterwards and in consequence of that recaption, so disposed of as to extinguish the mortgage debt — he had no right, so far as his interest in her was concerned, to recover damages beyond the value of the equity of redemption, which he had bought under his own execution. And therefore it seems to us, that the Circuit Judge erred in instructing the jury that Thomas had a right to recover the value of Laura, as well as “ smart money.”
Fourth. But the more radical and important question arises on the fourth instruction.
We are inclined to think that, Swigert’s power of attorney from the mortgagees, was sufficiently comprehensive to have authorized him to take Laura from the possession of Thomas, if his constituents themselves could have lawfully done so. And, though he had also a power from the sheriff of Franklin, and seems to have taken the slave for the purpose of having her sold under the levy of May, 1832 — yet, whatever may have been his motive or his object, we apprehend that if, as agent of the mortgagees, he could have legally taken her from Thomas, that authority should now protect him and his *224 associate from damages for the alleged trespass in taking her.
Mortgagee, after condition bros lien, has a right ■ — -when there is no agreement to the contrary — to assume the possession of the mortgaged property. Ilut, then, he will be accountable for rents, hire, or other income, derived from it— which goes to keep down the interest and reduce the principal of the debt. This is the common law rule; & it is not changed by the execution law of ’28, (§36,) which authorizes the sale, under execution, of all the right, title and interest, legal or equitable, which a mortgagor has. If, when the levy is made, the mortgagor is in possession, the sh’ff should take the property and deliver it to the purchaser, upon his giving bond, not to remove it out of the State within 12 months —as required by the act: without the bond, the purchaser has no right to the possession , as the bond is for the protection of the mortgagee. And still the mortgagee is not bound to let the property go to, or remain with, the purchaser ; but may assume and hold the possession whenever he will-unless there is a contract that the mortgagor is to retain the possession ; which will inure to the, benefit of the pur clraser: and an assignee, or purchaser, of an eq. of redemption , can have no better interest, or higher right, than the mortgagor had.
*224 Then, the question presented by the last of the enumerated instructions, is whether Thomas, as the purchaser of the mortgagor’s equity of redemption, had a legal right, as against the mortgagees, and without their consent, to retain the possession, and enjoy the use of Laura, until a decree should be rendered on the mortgage; or whether, the mortgage having been forfeited, the mortgagees had a legal right to the possession of all the mortgaged property, whenever they elected to take it, for their own use, under their mortgage.
A proper interpretation of the thirty sixth section of the general execution statute of 1828 (1 Stat. Law, 653,) must decide this question. As that enactment was antecedent to the date of the mortgage, executed in 1831, that mortgage should be considered as made subject to its provisions; and consequently, if the Legislature intended that the purchaser of an equity of redemption of a mortgagor in possession should be entitled to hold the possession of the thing mortgaged, even though, as between the parties to the mortgage, the mortgagee had a paramount right to the possession at the time of the sale of the mortgagor’s equity, the enforcement, against the mortgagee, of such right of possession, in favor of the purchaser of the equity of redemption, should not be deemed an impairment of the obligation of the contract between the mortgagor and mortgagee.
But we can perceive no adequate motive for giving to the purchaser of the mortgagor’s equity of redemption any other or greater right than the mortgagor had, and could have asserted, had his equity never been sold. The only object, as we presume, for subjecting equities of redemption to sale under execution, was to enable a creditor of a mortgagor to make his debt without the circuity and expense of a suit in chancery for redemption of- the mortgaged estate, for his own benefit as creditor. And the full effectuation of that, purpose does not require that the purchaser of the equity of redemption under an execution against the mortgagor, should acquire, by his purchase, any right to which the mort *225 gagor himself was not entitled. We will not, therefore, extend the statute beyond the obvious import of its literal provisions, and especially, as any interpretation which would divest a mortgagee of any common law right, would be rather unreasonable, and apparently unjust.
So, where the eq. of redemption in a slave was sold under a Ji. fa. and the purchaser gave the requi red bond, and re ceived the slave, and an agent of the mortgagees seized, removed, and retained tire slave; and the purchaser bro’t an action against the agent, for the alleged trespass, it is held, that— in the absence of proof of a right of possession, by agreement, in the mortgagor— the deft, may justify under the authority derived from the mortgagees.
After providing that, “ all the right, title and interest, “ legal or equitable, which the mortgagor has, shall be “ subject to be levied upon and sold by execution, in the “ same manner that such property might have been sold “ if no such incumbrance had existed” — the thirty sixth section (supra,) declares that, “ the purchaser shall take “ it subject to such incumbrance, and may pay off and “ discharge such incumbrance, and thereby perfect his “ title thereto, as the mortgagor, or other person having “ an equity of redemption therein, might doand provides, also, that the purchaser of an equity of redemption “shall, before he takes possession of the property, “ give bond and security that he will not, within twelve “ months, sell or remove the property out of the State; “ but that he will, during that time, have the property “ at all times forthcoming, unavoidable accidents ex- “ cepted, to any order or decree of any Court of competent jurisdiction;” and also that, “the courts of “ equity shall have full power to control the estate mort- “ gaged, whether the mortgage be forfeited or not, and “ to make all proper and necessary orders for its preser- “ vation and forthcoming.”
So much of the enactment as subjects equities of redemption to sale under execution, literally imports that only the mortgagor’s interest shall be sold; and the superfluous addition that it shall be sold just as if there had been no mortgage, certainly does not mean more than that the mortgagee’s- title shall not embarrass the sale of the mortgagor’s equity; or, in-other words, that the equity shall be as subject to sale as a legal right of the same value and extent would have been.
The provision respecting the bond to be given by the purchaser, before he shall take possession, does not necessarily give, or presuppose, a* right to the possession, as arising from the mere act of buying the mortgagor’s *226 equity of redemption. But the officer who sells should have the property in his possession when he sells it; he generally gets that possession from the mortgagor, as between whom and the purchaser of all his interest, the latter would always be entitled to the possession, from the officer, immediately after the sale under the execution. In most cases, the mortgagee is not conusant of the sale; and frequently the mortgagor has a right to the possession, as between himself and the mortgagee. Sometimes, therefore, the purchaser of a mortgagor’s interest will be entitled, even as against the mortgagee, to the possession and use of the property, and generally, almost always, he will have a right to a delivery of possession from the officer, after the sale. Knowing or being presumed to know all this, the Legislature very prudently provided — not that the purchaser should be entitled, as against the mortgagee, to the possession and use, merely as a consequence of his purchase of the mortgagor’s right; but only that the purchaser of such an interest shall not, in any case, be permitted even to take the possession, unless he shall have given the prescribed bond and security, required chiefly because the mortgagee had never consented to the possession and use by a stranger. And the provision respecting the jurisdiction of courts of equity over the property, after a sale of an equity of redemption, should, in our opinion, be understood as implying only that, if a mortgagee, even though entitled to the possession and profits, as against the purchaser of the mortgagor’s equity, shall be indisposed to take them, he may obtain security and redress in a court of equity.
Thus every provision in the enactment may harmonize, and each may have its full literal effect, without affecting, in any manner, any existing legal right of a mortgagee who has been no party to a sale of the mortgagor’s equity of redemption under execution. And no other interpretation is, in our opinion, authorized by the letter, context or objects of the enactment.
The purchaser of an equity of redemption buys what the mortgagor was entitled to, and no more; he takes *227 the mortgagor’s place — subject in all respect to the morl-gage — and may hold and use the property just as the mortgagor had a right to hold and use it, and might have continued to hold and use it, had there been no sale; but he acquires, as against the mortgagee, no right to which the mortgagor was not entitled and could not have asserted; and the mortgagee may treat such an execution purchaser of the equity of redemption precisely as he might have treated the mortgagor himself, or an ordinary assignee of his interest. This is our construction of the thirty sixth section of the execution statute of 1828.
Then, it appears in this case, that the mortgage had been forfeited long before Thomas’ purchase of Hole-man’s equity of redemption in Laura. And it contains no stipulation entitling Holeman to the possession and use of her after forfeiture. In such a case, there can, we presume, be no doubt that, upon common law principles, the mortgagees had a perfect legal right, any moment, to take possession of Laura, and avail themselves of her profits for extinguishing the interest and absorbing the principal of their debt.
We have no statute qualifying that right; and we are not prepared to decide that the prevailing practice, of permitting mortgagors to enjoy- the possession and profits of the mortgaged property until foreclosure, should operate as a constructive abrogation of the mortgagee’s common law right, or as an implied stipulation entitling the mortgagor, as a matter of right, to that possession which, as a matter of favor or of convenience, he is generally permitted to enjoy.
We are, therefore, of the opinion that, nothing appearing in this case to the contrary, the mortgagees had a legal right to take possession of Laura, under their mortgage, notwithstanding Thomas’s purchase of Holer man’s interest as mortgagor; and that had they, in their own proper persons, taken her out of the possession of Thomas, they may not have violated any of his rights, and his only remedy for securing or asserting his interest may therefore have been, either a conventional redemption, or a suit in chancery for compulsive redemp *228 tion; in either of which modes of settlement, the mortgagees would have been chargeable with the subsequent profits of Laura, and would, also, have been responsible for any disposition of her, which, as mere mortgagees, they had no right to make; and after an available sale of Holeman’s equity, they would have had no right to restore the possession to him, or permit him to enjoy it under them, without accounting themselves to the purchaser of that equity, for his interest in the slave, and for the value of her use.
And, as Swigert, as the agent of the mortgagees, may have had the same right under the same responsibilities in a court of equity, we are of the opinion that he and Shreve were not necessarily guilty of a trespass in taking Laura from Thomas, admitting that he had made a valid purchase of the equity of redemption.
There is no evidence conclusively showing that, by contract or otherwise, Holeman had a legal right, as against the mortgagees, to retain the possession and enjoy the use of Laura, after the mortgage debt had^become due.
Finally, therefore, it seems to us, that the peremptory and unqualified instruction we are now considering, was erroneous, and may have been prejudicial.
Wherefore, the judgment is reversed, and the cause remanded for a new trial.